ABRAHAM FOSTER, petitioner-respondent,

*v.*

LEVINIA FOSTER, defendant-appellant.

[Submitted March 1st, 1921.   Decided June 23d, 1921.]

1. Where a wife drove her husband from their home with an iron poker, with which she struck him, at the same time calling him abusive names, after which, on the same day, she had him arrested for assault and battery, which charge was dismissed for failure of proof, and she thereupon left their home, but later returned while he was away at his usual summer employment in the country and took absolute possession of the home and changed the lock on the door so that the husband on his return found himself locked out and unable to use his key and his request for a key to fit the new lock was not heeded and his efforts to effect a reconciliation were repulsed—*Held*, that the husband was entitled to a divorce on the ground of willful, continued and obstinate desertion.

2. A divorce will not be granted on the uncorroborated testimony or admissions of parties to the suit; in the case *sub judice* there is corroboration by third party witnesses of every element in the proofs necessary to sustain the decree.

———

On appeal from a decree *nisi* in chancery advised by an advisory master.

*Mr. George A. Douglas,* for the appellant.

*Messrs. McDermit & McDermit,* for the respondent.

The opinion of the court was delivered by

ACKERSON, J.

This is an appeal from a decree *nisi* in chancery, granting petitioner a divorce from his wife, the defendant, on the ground of desertion. The defendant contends that she did not desert her husband, but that he deserted her, and, therefore, the petition should have been dismissed. Both parties are colored and fifty-six years of age; were married at Dansville, Virginia, September 3d, 1884, and have had four children, two of whom are living, one a daughter, twenty-nine years of age and married, and the other, a daughter, twenty-six years of age and single.

The matrimonial voyage of these parties seems to have been a rough and stormy one from the very outset, and quarrels and domestic disturbances were frequent. The defendant was an *habilue* of fortune tellers and, by these seers of the occult art, was advised to watch her husband; that he had poisoned her sister and was trying to get rid of her, which, being formulated by the defendant, apparently without any foundation, into charges against petitioner, resulted in further disturbances, following which the parties seem to have ceased occupying the same bedroom, although continuing to live in the same house. Petitioner claims this condition existed because his wife, following these charges, did not want him to sleep with her, while she says it originated because her husband claimed to have a cold and his physician ordered him to sleep alone. But whatever may have been the original cause of this domestic condition, it had existed for over twelve years before the alleged desertion complained of, and seems, from the evidence, to have been mutually consented to, and, therefore, has small bearing upon this case.

Only a few years before their final separation, the petitioner purchased a home in another neighborhood, across the railroad from where they had been living in a rented house, and he did this, he says, because he wanted to encourage his wife and bring about domestic happiness, if possible, and he expressed his desires to his wife in the following language:

"Now, Lou, I have bought a home. I want you to lay down the devil on this side of the railroad and take up the Lord on the other side, and live like you ought to live, with a man, and your husband. I am sick and tired of it, this way, and she went over there and we lived very nicely for several months, and then she started her devilment again over in this house, and I did everything I could to please her, but there wouldn't nothing please her."

The defendant denies that her husband made this statement to her, but it is not denied that for several months after moving into the new house their relations were much more pleasant, but that thereafter the old friction returned with renewed vigor. The fact, however, that he bought this new home for $1,200, part on a mortgage which he later paid off, in spite of unpleasant domestic difficulties, gives great credence to his story and certainly shows that he was endeavoring, at this time at least, to do his part.

It appears that for several years petitioner was compelled by reason of his employment to leave his home in the latter part of April or 1st of May to go with his employer to his country home, where petitioner remained at work until they returned in the fall, and that this was always done with his wife's consent. In the latter part of April, 1911, only two or three days before he was to start for his employer's country place for the summer, the petitioner says that his wife, assisted by their daughter Bessie, drove him out of his home with an iron poker, and that his wife struck him with this poker and told him that she didn't want him with her, and that he was a "stinkin, low down scoundrel," and later, on the same day, swore out a warrant against him, presumably, for assault and battery, but his wife being unable to substantiate the charge against him, he was discharged and returned home, got his things and went to his work at his employer's country home, and that his wife immediately left his home, but returned while he was away and took absolute possession, and when he returned the following October he could not get in, and he found that his wife had changed the lock on the door so that he could not use his key, and he was locked out, and he was therefore obliged to take up his abode in a room over the garage at his employer's town house. A few days later he went again to his home and was admitted by his daughter Bessie,

but when he asked for a key it was not forthcoming. His wife did not appear, although she admits that she was in the house at the time, so, after getting some needed clothing, he returned to the room over the garage. Later he returned a third time to his home but could not get in. He also testified that when he first came back from the country this time, in October, he met his wife on the street, but she did not speak to him; that he tried to talk to her on other occasions, notably at their church, but that she would not permit him to do so, but would purposely turn away and avoid him. He also testified that he had asked several persons to speak to his wife for him in an effort to effect a reconciliation, and that her reply had been that she did not want him nor any of his nigger trash back. He is corroborated by Parthenia Flemming, an apparently disinterested witness, who says that at petitioner's request she spoke to his wife, shortly after they had parted, and asked her if she wouldn't take her husband back again, to which she replied: "No; I have changed the lock. I don't want him or none of his nigger trash back." Petitioner is also corroborated by his son-in-law, who says that he called at petitioner's home in May, 1911, shortly after he had gone to his summer's work, and talked with defendant, and that she said she had driven her husband away and never intended to live with him again. All of these statements were repeated to petitioner. Another witness, admittedly a friend of both parties, testified that he called at their home a year or so after their separation, a fact which was unknown to him when he called, and after telling him that her husband was not living with her, defendant said that she didn't care whether he returned home again or not—didn't care whether he ever came back. Defendant, of course, denies making any of the foregoing statements, but admits that she talked with the three last-mentioned witnesses at the times stated by them, and we can see no good reason why these persons, who had no apparent interest in this suit, should deliberately perjure themselves, and their testimony is not shaken.

Defendant admits that she quarreled with her husband a few days before he went away to his work the latter part of April, 1911, because, she says, he wanted to put her out of the house,

and she also admits that she swore out a warrant against him at this time and that after a hearing he was discharged. She further admits that after he went away to his work in the country, she changed the lock on the door of their home, but gives as her reason that the key fell into the stove and was burned so that when she found it in the stove it broke off so she couldn't use it, and as they only had the one key she was obliged to get a new lock. On cross-examination she was asked how the key happened to get into the fire, and she replied:

"The Lord only knows; I don't know. It might have been on account of peeling the potatoes, and putting the peelings in the fire; I don't know. We started to hunt for the key, just as you often will hunt for things, and we started cleaning the stove, and the key was in it."

She also said that a Mr. Stewart, who roomed with them then, tried to fix the old lock but couldn't, and later she testified that he put the old lock on the cellar door. It is significant that Mr. Stewart was not called as a witness regarding the lock and key, nor his absence explained; nor is it explained how the old lock without a key could possibly be used any more effectively on the cellar door than on the door from which it was removed; nor is a satisfactory reason given why a new key was not obtained or made for the old lock instead of replacing it with a new one at this particular juncture when such action could so easily be misunderstood. Defendant also admits that she had the use of the entire house without charge ever since May, 1911, and has had the income from roomers, and that her husband has paid the taxes.

Her daughter Bessie, although admitting that she was present on the occasion in the latter part of April, 1911, when her father says she assisted her mother in driving him out of the house with the aid of a poker, nevertheless, fails to say a single word about what happened on that important occasion, and does not even attempt to deny her father's assertions regarding it, although she was the only eye-witness besides the parties themselves, and this was the crucial point in the case, as it marked the beginning of the period of desertion complained of, and her testimony as to what happened at that time was vital to the defendant's case.

She admitted that her mother changed the lock on the door after her father had gone to his summer's work, and that her father came to the house in October, 1911, and asked for a key, but fails to tell us why one was not given to him, although he came there several times.

Defendant only called two other witnesses, her other daughter, Pearl, who was married and away from home during the occurrences which led up to this suit, and, therefore, could throw very little light on the subject, and a Mrs. Cassidy, who claimed that in June or July, two or three years before the trial, she went to the kitchen door of the house where she was working and heard petitioner say to a neighbor in the next lot about fifty yards away: "She [meaning defendant] had better go and get herself a man, because she wouldn't get him no more." This testimony seems very unreliable when we consider that it was made at a time when petitioner was customarily away at his summer work, as stated in his denial, and that it was the only remark the witness heard.

While we have emphasized somewhat the testimony of the petitioner and the defendant, we are not unmindful of the wholesome rule expressed in *Hague* v. *Hague*, *85 N. J. Eq. 537; Stieglitz* v. *Stieglitz, 112 Atl. Rep. 310,* and *Garrett* v. *Garrett, 83 N. J. Eq. 295,* that a divorce will not be granted upon the uncorroborated testimony or admissions of parties to the suit, and our conclusion in the case *sub judice* is not based upon such testimony alone, for we have found corroboration in the case by third party witnesses of every element in the proofs necessary to sustain the decree.

The question presented to us is purely one of fact, and while the testimony of the petitioner is in some respects contradictory, nevertheless, our examination of the whole case leads us to the conclusion that there was sufficient evidence to justify the advisory master, who had the opportunity of hearing and observing all of the witnesses, in finding that the defendant willfully deserted petitioner, and we question whether, under the circumstances of the case, and considering the temper and disposition of the defendant, and her attitude towards her husband, as shown by the evidence, there was any duty imposed upon petitioner to

make advances to his wife to terminate the separation (*Hall* v.
*Hall, 60 N. J. Eq. 469*) ; but if there was, we conclude that he
fully performed this duty, and that defendant's desertion was
not only willful but also continued and obstinate.

The decree *nisi* will be affirmed.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD,
PARKER, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH,
WHITE, HEPPENHEIMER, WILLIAMS, GARDNER, ACKERSON—14.

*For reversal*—None.